CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAR 27 2020
JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | |
|---|---|
| LATAURES L.,[1] | ) |
|     Plaintiff, | )  Civil Action No. 4:18-cv-00067 |
| | ) |
| v. | )  REPORT & RECOMMENDATION |
| | ) |
| COMMISSIONER OF SOCIAL | )  By:   Joel C. Hoppe |
| SECURITY, | )          United States Magistrate Judge |
|     Defendant. | ) |

Plaintiff Lataures L. asks the Court to review the Commissioner of Social Security's final decision denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me under 28 U.S.C. § 636(b)(1)(B). ECF No. 11. Having considered the administrative record, the parties' briefs, and the applicable law, I cannot find that the Commissioner's final decision is supported by substantial evidence. Accordingly, I respectfully recommend that the decision be reversed and the case remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

1

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or

equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 426.920(a)(4).[2] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Lataures filed for SSI and DIB alleging that she was disabled by an intellectual disorder, attention deficit hyperactivity disorder, severe asthma, and severe bronchitis. *See* Administrative Record ("R.") 75, 140, 313–19, 346–49, ECF No. 9. She was thirty years old, or a "younger person" under the regulations, when she allegedly became disabled on November 30, 2013. R. 140; 20 C.F.R. §§ 404.1563(c), 416.963(c). Disability Determination Services ("DDS"), the state agency, denied her SSI claim initially in October 2015, R. 139–53, and upon reconsideration in February 2016, R. 154–70.[3] On August 10, 2017, Lataures appeared with counsel and testified at an administrative hearing before ALJ Mary Peltzer. R. 95–138. A vocational expert ("VE") also testified at this hearing. *See id.*

ALJ Peltzer issued an unfavorable decision on January 25, 2018. R. 75–89. Lataures's asthma, obesity, intellectual disorder, and major depressive disorder were "severe" medical impairments, R. 78, but they did not meet or equal the relevant Listings, *see* R. 78–82 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 3.03, 12.04, 12.05). She had the residual functional capacity

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

[3] Lataures filed her DIB claim on August 10, 2017. *See* R. 75, 346–49. The ALJ addressed both claims in her written decision. R. 75.

3

("RFC") to perform "medium work"[4] with the following limitations:

> no [climbing] ladders, ropes, or scaffolds; frequent balancing; occasional stooping and crouching; occasional exposure to extreme cold, extreme heat, humidity, wetness, respiratory irritants . . . and workplace hazards . . . , but no exposure to unprotected heights. She can perform unskilled work . . . involving simple, routine tasks in a static work environment where changes in tasks are infrequent and explained when they do occur, [there is] no independent goal setting, and where the pace of productivity is not dictated by an external source over which she has no control. She can have occasional contact with coworkers[, but] no tandem work assignments and no tasks involving contact with the general public.

R. 82. Based on this RFC and the VE's testimony ALJ Peltzer concluded at step five that Lataures was not disabled after November 2013 because she still could perform certain "light"[5] to "medium" unskilled occupations (cleaner/sweeper, janitor, marker) that offered a significant number of jobs in the national economy. R. 88; *see* R. 129–32. The Appeals Council denied Lataures's request to review that decision, R. 1, and this appeal followed.

### III. Discussion

Lataures makes two arguments on appeal. *See* Pl.'s Br. 3–5, 5–8, ECF No. 13. First, she argues ALJ Peltzer erred by finding Lataures's intellectual disorder did not meet Listing 12.05B, noting in particular that the ALJ "ignored" Lataures's academic records showing she had "marked" limitations in her abilities to understand, remember, and apply information and to maintain concentration, persistence, and pace. *See id.* at 3–5. Second, she objects that ALJ Peltzer's RFC finding does not reflect Lataures's "limited ability to complete a normal workday

---

[4] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds," 20 C.F.R. §§ 404.1567(c), 416.967(c), plus standing, walking, and/or sitting for about six hours in an eight-hour workday, SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). A person who can do medium work can also do less-demanding "light" work. 20 C.F.R. §§ 404.1567(c), 416.967(c).

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," 20 C.F.R. §§ 404.1567(b), 416.967(b), plus standing, walking, and/or sitting for about six hours in an eight-hour workday, *see* SSR 83-10, 1983 WL 31251, at *5–6.

4

or workweek without interruption," her "need for very close supervision," or her reliance on supervisors to repeat even "simplified instructions." *Id.* at 5. While the Court cannot go so far as to make those findings, there's no question ALJ Peltzer failed *at both steps* to explain how she made certain findings, why the evidence she chose to cite (if any) supported her conclusions, and how she weighed other evidence in the record that either contradicted those findings or indicated Lataures had greater work-related functional limitations than ALJ Peltzer found. In short, ALJ Peltzer's "failure to build an accurate and logical bridge from the evidence to [her] conclusion constitutes reversible error," *Lewis*, 858 F.3d at 868, because the Court cannot "determine whether the . . . decision is supported as a matter of fact and law," *Kenne v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018).

A. *Listing 12.05B*

The Listings are examples of medical conditions that "ordinarily prevent a person from working" in any capacity, "not just [in] substantial gainful activity." *Sullivan v. Zebley*, 493 U.S. 521, 532–33 (1990) (quotation marks omitted). If a claimant's severe impairment(s) "satisfies all of the criteria of [the corresponding] listing, including any relevant criteria in the introduction," 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3), then the claimant is "entitled to a conclusive presumption" that he or she is disabled, *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (citing *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)). To make this determination, the ALJ must identify the relevant listed impairment(s) and "compare[] each of the listed criteria" to the relevant evidence in the record. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). The ALJ's step-three findings "are supposed to represent reasoned consideration of all the pertinent evidence, and are not simply an opportunity to give the claimant the benefit of the doubt at one step while taking it away at the next step." *Claiborne v. Comm'r, Soc. Sec. Admin.*, Civ. No.

5

SAG-14-1918, 2015 WL 2061284, at *4 (D. Md. May 1, 2015). They also play an important role in the ALJ's "holistic and fact-specific [RFC] evaluation" before step four. *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017).

\*

ALJ Peltzer considered whether Lataures's cognitive impairment met Listing 12.05, which "is based on the three elements that characterize intellectual disorder: Significantly subaverage general functioning; significant deficits in current adaptive functioning; and the disorder manifested before age 22." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(H)(1); *see id.* § 12.05(A), (B). "Intellectual functioning refers to the general mental capacity to learn, reason, plan, solve problems, and perform other cognitive functions." *Id.* § 12.00(H)(2)(a). Listing 12.05(B)'s first prong requires a valid "full scale . . . IQ score of 70 or below" on a standardized test of general intelligence, *id.* § 12.05(B)(1)(a), that was administered and/or interpreted by a qualified specialist, *see id.* § 12.00(H)(2)(a)–(d).

Christopher Cousins, Ph.D., administered the Wechsler Adult Intelligence Scale–Fourth Edition ("WAIS-IV") to Lataures at consultative examinations on December 29, 2014, and August 1, 2017. *See* R. 468–75 (Ex. 1F); R. 629–34 (Ex. 11F). Lataures achieved full-scale IQ scores of 56 and 57, respectively, placing her in the "moderate" to "mild" range of intellectual disability. R. 472, 631–32; *see also* R. 84–85, 144, 149, 165. The DDS psychologist who reviewed Lataures's records in February 2016 opined that her IQ of 56 reflected "intellectual and memory attainments . . . in the deficient range," R. 161, and "would be listing level" but for evidence of Lataures's "daily activities suggest[ing] higher functioning[] consistent with [b]orderline ability," R. 160–61. In August 2017, Dr. Cousins opined that all "subtest scores were in the borderline to deficient range and characteristic of someone with long-term and

chronic intellectual impairment." R. 631. "There was no evidence of malingering or symptom exaggeration" at this evaluation. R. 632; *see* R. 549–50 (Dr. Cousins noting Lataures's responses during their second consultative exam in February 2016 were so severely lacking that he could not "completely rule out malingering or symptom exacerbation"). ALJ Peltzer noted Lataures's performance on the WAIS-IV showed full-scale IQ scores of 56 and 57, R. 84–85, but she did not make a finding about whether either score satisfied Listing 12.05(B)'s first prong, *see* R. 80–81. There is no indication she doubted the scores' validity or reliability. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(H)(2)(b); Def.'s Br. 6–13, ECF No. 16.

\* \*

"Adaptive functioning" means how a person "learn[s] and use[s] conceptual, social, and practical skills in dealing with common life demands," including her "typical functioning at home and in the community, alone or among others." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(H)(3)(a). Under Listing 12.05(B)'s second prong, the ALJ must rate the claimant's overall ability to function "independently, appropriately, effectively, and on a sustained basis" in four areas of mental functioning: (a) understanding, remembering, and applying information; (b) interacting with others; (c) concentrating, persisting, and maintaining pace; and (d) adapting and managing oneself. *Id.* § 12.05(B)(2)(a)–(d). To meet this prong, the claimant must show "[s]ignificant deficits in adaptive functioning currently manifested by extreme limitation [in] one, or marked limitation [in] two," of the four areas. *Id.* § 12.05(B)(2).[6] The ALJ's ratings should reflect a reasoned determination, after evaluating "all of the relevant medical and non-medical evidence" in the longitudinal record, *id.* § 12.00(F)(3)(a), about the claimant's current

---

[6] ALJs use a "five-point rating scale" to evaluate the person's ability "to function in [each] area independently, appropriately, effectively, and on a sustained basis": none or no limitation; mild or "slight" limitation; moderate limitation or "fair" functioning; marked or "serious" limitation; and extreme limitation or no ability to function at the benchmark level. *Id.* § 12.00(F)(2)(a)–(e).

7

capacity to function at this benchmark level and to complete tasks "on a sustained basis," *id.* § 12.00(H)(3)(d). *Patterson*, 846 F.3d at 659–62; *Claiborne*, 2015 WL 2061284, at *4; *see also* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(5) (need for longitudinal evidence); *id.* § 12.00(C)(6) (evidence of functioning in familiar and unfamiliar situations); *id.* § 12.00(D) (evidence of help, support, or structure); *id.* § 12.00(F)(3), (H)(3) (evidence of formal testing, daily activities, support or supervision, and work activity).

ALJ Peltzer found that Lataures's severe intellectual disorder caused only "mild" limitations in her capacities for understanding, remembering, or applying information and "moderate" limitations in her capacities for concentrating, persisting, or maintaining pace. R. 79. Her step-three analysis contains two findings or conclusions specific to each area, *id.*, followed by a brief discussion of why Lataures's "medical and educational records do not indicate significant deficits in adaptive functioning currently manifested by a . . . marked limitation" in any of the four areas, R. 81–82.

"Understand, remember, or apply information" captures a person's "abilities to learn, recall, and use information to perform work activities." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(E)(1). Examples include understanding and learning terms, instructions, and procedures; describing work activity to someone else, answering questions and providing explanations; and identifying and solving problems or correcting mistakes. *Id.* ALJ Peltzer found "mild" limitations in this area because Lataures testified that she could "drive a car, go out alone, and shop in stores with a list. The record reflect[ed] some deficits in memory, but they [were] no more than mild." R. 79. She did not cite any evidence to support the latter finding, *id.*, which is impossible to reconcile with her later summary of two consultative examiners' consistently abnormal observations on mental-status exams, R. 83–86. *See Woods v. Berryhill*, 888 F.3d 686,

8

694 (4th Cir. 2018) ("[T]he ALJ must *both* identify evidence that supports his conclusion *and* build an accurate and logical bridge from that evidence to his conclusion." (cleaned up)); *Kersey v. Astrue*, 614 F. Supp. 2d 679, 693 (W.D. Va. 2009) ("[I]t is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein.").

ALJ Peltzer recited Dr. Cousins's findings that Lataures exhibited "poor immediate and recent memory, and [at best] fair remote memory" during her first consultative evaluation in December 2014, R. 83–84 (citing R. 471–74); was only "partially oriented to time and place" and her "memory, judgment, and common sense reasoning appeared to be poor" at her second evaluation in February 2016, R. 85 (citing R. 548–49); and "had difficulty understanding instructions on multiple occasions" during her third evaluation in August 2017, R. 85–86 (citing R. 630, 632). She also noted Dr. Cousins's opinion that Lataures's performance on the WAIS-IV in December 2014 "placed her memory functioning . . . primarily within the extremely low range," R. 84 (citing R. 472–74), though she did not mention his opinion that the scores "were consistent with" the "pronounced memory difficulties" Lataures exhibited during their first clinical interview, R. 474. *Cf. Lewis*, 858 F.3d at 869 ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding."). ALJ Peltzer did not explain how any of this or other cited evidence, such as Lataures's tendency to give one-word answers to questions and difficulty explaining or elaborating, R. 84–85, factored into the conclusion that she had at most "slight" limitations in this functional area, R. 79. *See* R. 471, 540, 548–49, 630–32.

"Concentrate, persist, or maintain pace" refers to the "abilities to focus attention on work

activities and stay on task at a sustained rate." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(E)(2). Examples include starting and performing tasks the person knows how to do, working at an appropriate and consistent pace, completing tasks in a timely manner, ignoring or avoiding distractions while focusing on a task, and working around others without interrupting or distracting them. *Id.* ALJ Peltzer found "moderate" limitations in this area because Lataures "reported difficulty keeping pace at prior jobs" and "[i]ntelligence testing revealed an intellectual disorder," but "no specific deficits in concentrating, persisting, or maintain pace [were] noted." R. 79. She did not say how she made the second finding, which, again, is difficult to reconcile with evidence she appears to have considered later in her decision. For example, ALJ Peltzer referenced (but did not summarize) the DDS psychologist's report, R. 86, which states Lataures's initial WAIS-IV scores could "be listing level" and showed "intellectual and memory attainments . . . in the deficient range," R. 160, 161. She also summarized both of Dr. Cousins's consultative reports showing Lataures's WAIS-IV processing-speed index score fell at or below the first percentile, R. 472–73, 631. *See* R. 84, 85 (citing R. 472, 631). But, she did not explain how these deficits factored into her conclusion that Lataures's functioning in this area was "fair" or at most moderately limited. 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(F)(2)(c). Her "failure to build an accurate and logical bridge from the evidence to that conclusion constitutes reversible error." *Lewis*, 858 F.3d at 868,

    ALJ Peltzer's brief, more generalized discussion of why Lataures's "medical and educational records" did not support finding a "marked" limitation in any of the four functional areas, R. 81–82, is also a few planks short of an accurate and logical bridge. To start, she did not discuss any information in Lataures's educational records, *see* R. 79–88, and did not cite any evidence or otherwise explain how she determined "testing in school indicated some deficits in

10

adaptive functioning," R. 81. Lataures's school records show she was enrolled full-time in an "Educable Mental Disability program," R. 367; *see* R. 353–57, because she "demonstrated significant delays in the areas of adaptive functioning where her performance fell within the mildly mentally deficient range," R. 368. She started receiving special-education instruction and support services in a self-contained classroom in the fall of 1993, R. 353–57, and stayed in that small structured environment until she graduated from high school with a "special" diploma at age eighteen in the spring of 2002, R. 384; *see* R. 367, 396–99, 421. *Cf.* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(5), (D)(2) (noting longitudinal evidence is needed to help the ALJ "evaluate any variations in the level of . . . functioning," and that the "length of time" the claimant spends in a supportive program provides important information about her functioning). Lataures was not eligible for a "standard" or "modified standard" diploma because she never passed a statewide standardized test "designed to measure competency at the sixth-grade level in reading comprehension, mathematics, and writing."[7] R. 385; *see* R. 367, 386, 384–99.

At age thirteen, Lataures "consistently performed within the lowest limits of the borderline range to the upper limits of the mildly mentally deficient range in verbal reasoning, abstract visual reasoning, and short-term memory." R. 368. Her "academic achievement fell within the severely deficient range with . . . a grade equivalent of 2.5," which was "in line with cognitive expectancies [given] her performance" on standardized tests. R. 369–70. At sixteen, she still had trouble "accurately describing scenes" and "giving directions [that] would enable her listener to complete certain tasks" correctly. R. 380. She functioned at a 2.8 to 3.6 grade-

---

[7] This evidence also undercuts ALJ Peltzer's finding that Lataures had "at least a high school education," R. 88. *See* 20 C.F.R. §§ 404.1564(d), 416.964(d) ("High school education and above means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above. We generally consider that someone with these educational abilities can do semi-skilled through skilled work.").

level equivalent and could "handle material on or slightly above" those levels "when [she was] focused." *Id.* In her final year of school, Lataures needed "[s]mall group and individualized instruction" in a self-contained setting "specifically" because her "[a]daptive behavior interfere[d] with the ability to perform academic tasks independently." R. 398. Classroom accommodations included repeating instructions, allowing extra time to complete tasks, and seating near the front of the room. *Id.* Still, Lataures "often" forgot to do her classwork, had trouble staying on task, and "interact[ed] with peers at inappropriate times during class." R. 388. This longitudinal evidence bears directly on Lataures's overall ability to function independently, appropriately, effectively and on a sustained basis in a workplace setting, 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(4)–(6), (F)(1)–(3); *see also* Def.'s Br. 9 (citing R. 357, 367–70, 384), and undermines the ALJ's otherwise unexplained assessment of Lataures's adaptive functioning. ALJ Peltzer did not even acknowledge its existence. *See Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) ("Although an ALJ need not mention every snippet of evidence in the record, [she] must connect the evidence to the conclusion; in so doing, [s]he may not ignore entire lines of contrary evidence.").

The rest of ALJ Peltzer's cursory step-three discussion simply announces her findings without providing a logical, accurate analysis of the pertinent factors and all relevant evidence in the record. Most of those reasons do not hold up to even deferential scrutiny. ALJ Peltzer found that Lataures "attended and completed cosmetology" classes after high school; did substantial gainful activity without accommodations in 2007–2009, 2012, and 2013; had perfect attendance at a vocational program in July 2017; and "earned her personal care assistant certificate." R. 81, 86 (citing R. 119–21, 326–27, 329); *see* Def.'s Br. 9–10. In fact, Lataures testified that she "[t]ried to get [her] PCA" through the vocational program, R. 119–20, but she "missed a day and

[was] just trying to get to the part[] where [she] complete[d] it," R. 119. *See Hines*, 453 F.3d at 566 ("The deference accorded an ALJ's findings of fact does not mean that we credit even those findings contradicted by undisputed evidence."). There is no evidence about the cosmetology school Lataures attended or whether she was able to function in that environment independently, appropriately, effectively, and on a sustained basis. *See* R. 421 ("Have you completed any type of . . . trade or vocational school? No."). Lataures also indicted that she could not even take the State Boards to get her cosmetology license, R. 120–21, not merely that she "was not able to pass" them as ALJ Peltzer found, R. 86.

Additionally, although Lataures did not produce "evidence *from the employers* that [her] work activity was accommodated," R. 81 (emphasis added), ALJ Peltzer noted one employer in late 2014 "expressed concerns over her inability to perform the job adequately." R. 83 (citing R. 469). That short-lived job involved "look[ing] at airbags," R. 78, to make sure they weren't defective, R. 106, 546. Again, ALJ Peltzer did not explain how this evidence factored into her adaptive-functioning analysis. She also did not mention Lataures's testimony that she left or was fired from other jobs in 2009–2015 because she "couldn't keep up" with repetitive tasks, R. 105, 107, had trouble "[j]ust remembering how to make [a] sandwich" as asked, R. 106, and was too slow picking items off of a conveyer belt and putting them in a box, R. 108–09, 114. Nor did she mention that Lataures's friends and family lined up two of those jobs for her, R. 108–09, 112, one of which involved "greeting people" and opening dressing rooms when asked, R. 112–13. Contrary to the Commissioner's suggestion, Def.'s Br. 9–10, the fact that Lataures "engaged in work activity, or that [she] work[ed] intermittently or steadily in a job commensurate with [her] abilities, will not always mean that [she] do[es] not have" serious "deficits in adaptive functioning," 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(H)(3)(e). Rather, ALJ Peltzer should

have "consider[ed] all factors involved in [her] work history," including "the reason the work ended," before reaching "any conclusions about [her] adaptive functioning." *See id* § 12.00(H)(3)(e). Her failure to discuss this evidence is reversible error.

Finally, ALJ Peltzer cited examples where Lataures reported that she could drive a car, go shopping alone with a list, count change, watch television and go to church, concentrate on things, bathe, feed, and dress herself without reminders, do household chores, "occasionally lived alone in an apartment" with her small dog, knew to ask directions if she was unsure how to get somewhere, and "could text on a cell phone to get information." R. 81–82 (citing R. 122, 143, 159). ALJ Peltzer then concluded that "[t]he record support[ed] no more than moderate limitation" in any area of adaptive functioning, R. 82, but she did not explain how she reached that conclusion based on the evidence she cited. *See Woods*, 888 F.3d at 694.

More problematic, the Listings make clear that the fact a person "engage[s] in common everyday activities, such as caring for [her] personal needs, preparing simple meals, or driving a car, will not always mean that [she] do[es] not have" serious "deficits in adapting functioning." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(H)(3)(d)(i). The ALJ accordingly "will not assume" her "ability to do some common everyday activities, or to do some things without help or support, demonstrates that [her] mental disorder does not" seriously limit her ability to function independently, appropriately, effectively, and on a sustained basis in a workplace setting. *Id.* § 12.00(H)(3)(d)(ii). While I cannot tell whether ALJ Peltzer made that assumption, she did rely heavily on Lataures's own statements about how she handled basic activities, R. 81–82, despite later alluding to evidence that Lataures sometimes overstated her level of functioning and was a consistently unreliable historian, *see* R. 83–86 (citing R. 468–71, 539–40, 545–48, 630–32). The ALJ is supposed to "consider the complete picture" of the claimant's "functioning, including the

14

kinds, extent, and frequency of the help and support" she receives when determining her capacity for "mental functioning in a work setting." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(H)(3)(a). It is not clear ALJ Peltzer did that in Lataures's case.

B.     *Mental RFC*

ALJ Peltzer made the same fundamental errors in her RFC analysis, which I will discuss briefly. *See Patterson*, 846 F.3d at 659, 662–63. A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite her medical impairments and symptoms.[8] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016). Generally, a reviewing court will affirm the ALJ's RFC findings when it is clear that she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and she built an "accurate and logical bridge from that evidence to h[er] conclusion[s]," *Woods*, 888 F.3d at 694. *See Thomas v. Berryhill*, 916 F.3d 307, 311–12 (4th Cir. 2019).

ALJ Peltzer found Lataures could perform "unskilled work . . . involving simple, routine tasks in a static work environment where changes in tasks are infrequent and explained when

---

[8] "Symptoms" are the claimant's own description of her medical impairment. 20 C.F.R. §§ 404.1502(i), 416.902(n).

15

they do occur, [there is] no independent goal setting, . . . the pace of productivity is not dictated by an external source over which she has no control," and there is at most "occasional contact with coworkers, but "no tandem work assignments and no tasks involving contact with the general public." R. 82. She discussed some of Lataures's statements to the agency and providers, as well as certain substandard test results, conflicting medical opinions, generally unremarkable mental-status findings during a few visits to the emergency room, and the consistently abnormal findings on Dr. Cousins's comprehensive neurocognitive and psychological exams in December 2014, February 2016, and August 2017. R. 83–86.

ALJ Peltzer gave "great weight" to the DDS reviewing psychologists' medical opinions because "[t]he mental limitations" they identified were "consistent with the mental status examinations in the record," R. 86, but she did not say which of the conflicting exams she had in mind. *See id.* ("[T]he claimant's mental status examinations *outside of the consultative examinations* generally revealed normal mood, affect, cognition, and memory." (emphasis added)). It is not enough for the ALJ to simply point out conflicts in the evidence; she must explain how she considered and resolved them in reaching her conclusions. *Woodhouse ex rel. Taylor v. Astrue*, 696 F. Supp. 2d 521, 533 (D. Md. 2010). ALJ Peltzer's failure to do so here means her "analysis is incomplete and precludes meaningful review." *Monroe v. Colvin*, 826 F.3d 176, 190 (4th Cir. 2016).

ALJ Peltzer's RFC finding also reflects most, but not all, of the mental limitations the DDS reviewers identified. *Compare* R. 82, *with* R. 149–50, 165–67. She appears to have rejected, without explanation, their opinions that Lataures was "somewhat dependent on others to direct her day," "may need additional supervision to ensure tasks are completed," depended on "instructions and help she receive[d] throughout the day" to perform activities of daily living,

and had moderate limitations persisting or staying on task, R. 149–50, 165–67. "The ALJ's decision cannot be supported by substantial evidence when [s]he fails to adequately explain [her] rationale for rejecting the opinions of those whom [s]he otherwise gave great weight to in arriving at [the] decision." *Warren v. Astrue*, No. 2:08cv3, 2008 WL 3285756, at *11 (W.D. Va. Aug. 8, 2008).

Finally, I highlight certain errors in the ALJ's credibility analysis so they will not be repeated on remand. First, ALJ Peltzer discounted Dr. Cousins's opinions and Lataures's testimony in part because Dr. Cousins noted in February 2016 that he could not "completely rule out malingering or symptom exacerbation," R. 549–50, to explain the abnormal findings on that mental-status exam. *See* R. 86, 87. She did not mention Dr. Cousins saw "no evidence of malingering or symptom exaggeration" on the exams in December 2014 and August 2017. R. 474, 632. On all three occasions, Latarures had a blunted or distant presentation; responded to questions tersely without elaborating or explaining her answers; could not recall what day it was or relay basic information about her personal history; and exhibited "poor" memory, general fund of information, abstract thinking and basic calculation ability, judgment, and common sense reasoning ability. R. 471, 548–49, 630–31. She twice exhibited psychomotor retardation, avoided eye contact, did not know the current date, and could not tell Dr. Cousins which city they were in. R. 471, 548. Dr. Cousins opined after all three exams that Lataures would need special instructions or extra supervision; likely could not perform even simple repetitive work activities on a consistent basis for eight hours a day, five days a week; and would have trouble coping with typical stressors in competitive work. R. 474–75, 550, 632; *see* R. 84–87. Without more explanation from the ALJ, I cannot find Dr. Cousins's isolated comment undermines his otherwise consistent findings and opinions—made over the course of three years—bearing on

17

Lataures's specific work-related mental limitations. R. 86, 87; *cf. Testamark v. Berryhill*, 736 F. App'x 395, 399 (4th Cir. 2018) (remanding where the ALJ "seize[d] on insignificant inconsistencies in the treatment record while overlooking the record's broader import"); *Kemp v. Astrue*, Civ. No. 6:08-313, 2009 WL 580450, at *10 (D.S.C. Jan. 26, 2009) (recommending remand where ALJ improperly relied "on isolated snippets of evidence that support[ed] his ultimate conclusion without mentioning or reconciling the evidence that directly contradict[ed] his position"), *adopted by* 2009 WL 580336 (D.S.C. Mar. 5, 2009).

The ALJ also must explain why she apparently rejected Dr. Cousins's explanation that the functional limitations in his December 2014 and February 2016 reports were "based on [Lataures's] performance" during contemporaneous mental-status evaluations, R. 474, 550, not his initial misdiagnosis of traumatic brain injury or Lataures's subjective assertions, R. 87 (citing R. 546–47, 549). Lataures's unremarkable brain scan from January 2015 showing no intracranial mass lesion, "acute recent infarction," or "definite etiology for [her] headache," R. 492, likely is not a reliable way to gauge the severity or functionally limiting effects of a "long-term and chronic intellectual impairment" not caused by observable trauma or disease process, R. 631; *see* R. 549. *Compare* R. 86 (finding that Lataures's "IQ scores reflect . . . an intellectual disorder, [but] Dr. Cousins noted that an MRI essentially found no remarkable findings"), *with United States v. Kasim*, No. 2:07cr56, 2008 WL 4822291, at *2 (N.D. Ind. Nov. 3, 2008) ("[A] CT scan provides no reliable indication of intellectual impairment.").

Second, ALJ Peltzer rejected Dr. Cousins's limitations on Lataures's ability to stay on task and complete a normal workday or workweek, R. 474–75, 550, 632, because she found they were "not consistent with her reported activities of daily living detailed [earlier in the decision] such as driving, living alone, and caring for a pet." R. 87; *see* R. 86 (finding that Lataures

18

"recently attended school every day for one month and earned her personal care assistant certificate," "attended and completed cosmetology school," could drive independently and go shopping with a list, handled her own personal care, cleaned the bathroom and kitchen, made her bed, cooked, and "helped with the laundry"). As noted, some of the ALJ's findings about Lataures's activities either were "contradicted by undisputed evidence," *Hines*, 453 F.3d at 566, or overstated "the extent to which she [could] perform them," *Woods*, 888 F.3d at 694. Even accepting ALJ Peltzer's description, however, she provided no explanation as to how driving, occasionally living alone, and having a small dog—or any of the limited activities depicted by Lataures—"showed that [s]he could persist through an eight-hour workday" on a regular and continuing basis. *Brown*, 873 F.3d at 263.

* * *

I take no position on whether Lataures is entitled to disability benefits for the relevant period. Because the ALJ made so many errors evaluating Lataures's intellectual disorder at step-three, however, I "cannot say that [s]he properly assessed [Lataures's] RFC. And because [I] cannot gauge the propriety of the ALJ's RFC assessment, [I] cannot say that substantial evidence supports the [Commissioner's] denial of benefits." *Patterson*, 846 F.3d at 662. On remand, the Commissioner must consider and apply the correct legal rules to all the relevant evidence in the record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, assuming Lataures cannot show her intellectual disorder meets or medically equals Listing 12.05B, provide a logical link between the evidence he found credible and each conclusion in the RFC determination.

IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Plaintiff's Motion for Summary Judgment, ECF No. 12, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 15, **REVERSE** the Commissioner's final decision, **REMAND** the case for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** the case from this Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: March 27, 2020

Joel C. Hoppe
United States Magistrate Judge